FILED IN CLERK'S OFFICE
U.S.D.C. Rome

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

FEB 25 2010

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

| | |
|---|---|
| JOSE VELASQUEZ,<br>MARIA I. ROLDOS and<br>PAUL E. DYER,<br><br>        Plaintiffs,<br><br>    v.<br><br>SOUTHERN GROUP, LLC, SOUTHERN<br>REAL ESTATE OF TENNESSEE, LLC,<br>TRAVIS SHIELDS, IN HIS<br>INDIVIDUAL CAPACITY AND D/B/A<br>SOUTHERN REAL ESTATE, SOUTHERN<br>REAL ESTATE, LLC AND MORTGAGE<br>PAYMENT SERVICES, LLC,<br>JOSHUA DOBSON, IN HIS<br>INDIVIDUAL CAPACITY AND D/B/A<br>SOUTHERN REAL ESTATE, SOUTHERN<br>REAL ESTATE, LLC AND MORTGAGE<br>PAYMENT SERVICES, LLC,<br>THOMAS DOBSON, IN HIS<br>INDIVIDUAL CAPACITY AND D/B/A<br>SOUTHERN REAL ESTATE, SOUTHERN<br>REAL ESTATE, LLC AND MORTGAGE<br>PAYMENT SERVICES, LLC,<br>STEVEN BOSSON, RODNEY BRADLEY,<br>THE HAISTEN GROUP, INC.,<br>FARM CREDIT SERVICES OF MID-<br>AMERICA, FLCA, SOUTHERN<br>MOUNTAIN RESORTS, LLC, and<br>WARRANTY TITLE INSURANCE<br>COMPANY, INC.,<br><br>        Defendants. | Civil Action File No.<br>No. _____ |

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**4:10.CV-227 HLM**

## COMPLAINT

COME NOW Plaintiffs Jose Velasquez (hereinafter, "Plaintiff Jose"), Maria I. Roldos (hereinafter, "Plaintiff Isabel") and Paul E. Dyer (hereinafter, "Plaintiff Paul") and file this

1



Complaint against the Defendants named herein. In support of said Complaint, Plaintiffs show this Court the following:

**PARTIES, JURISDICTION, AND VENUE**

1.

Plaintiff Jose is an individual and resident of Decatur, DeKalb County, Georgia.

2.

Plaintiff Isabel is an individual and resident of Decatur, DeKalb County, Georgia.

3.

Plaintiff Paul is an individual and resident of Miami-Dade County, Florida.

4.

Venue is proper in this Court by virtue of LR 3.1(B)(2), NDGa., and 28 U.S.C.A. § 1391.

5.

This action involves matters arising under the laws of the United States, so this Court has subject matter jurisdiction. 28 U.S.C.A. § 1331.

6.

Defendant Southern Group, LLC (hereinafter, "Defendant Southern Group") is a Tennessee limited liability company, with headquarters in Kimball, Tennessee, and is registered with the Georgia Secretary of State to transact business in Georgia.

7.

Defendant Southern Group may be served through its registered agent, Registered Agents Legal Services, LLC, at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, Georgia 30076.

8.

Defendant Southern Group is subject to the personal jurisdiction of this Court by virtue of its presence in the State of Georgia.

9.

Defendant Southern Real Estate of Tennessee, LLC (hereinafter, "Defendant Southern Tennessee") is a Tennessee limited liability company, with headquarters in Kimball, Tennessee, and is registered with the Georgia Secretary of State to transact business in Georgia.

10.

Defendant Southern Tennessee may be served through its registered agent, Registered Agents Legal Services, LLC, at 900 Old Roswell Lakes Parkway, Suite 310, Roswell, Georgia 30076.

11.

Defendant Southern Tennessee is subject to the personal jurisdiction of this Court by virtue of its presence in the State of Georgia.

12.

Defendant Travis Shields (hereinafter, "Defendant Shields") is an individual and resident of the State of Tennessee and may be served at 1024 Water Front Place, Kimball, Tennessee 37347.

13.

Defendant Shields is subject to the personal jurisdiction of this Court by virtue of O.C.G.A. § 9-10-91, the Georgia Long Arm Statute.

14.

Defendant Joshua Dobson (hereinafter, "Defendant J. Dobson") is an individual and resident of the State of Tennessee and may be served at 1009 Water Front Place, Kimball, Tennessee 37347.

15.

Defendant J. Dobson is subject to the personal jurisdiction of this Court by virtue of O.C.G.A. § 9-10-91, the Georgia Long Arm Statute.

16.

Defendant Thomas Dobson (hereinafter, "Defendant T. Dobson") is an individual and resident of the State of Tennessee and may be served at 1020 Water Front Place, Kimball, Tennessee 37347.

4

17.

Defendant T. Dobson is subject to the personal jurisdiction of this Court by virtue of O.C.G.A. § 9-10-91, the Georgia Long Arm Statute.

18.

Defendants Shields, J. Dobson and T. Dobson are the owners of and do business as Southern Real Estate, LLC and Mortgage Payment Services, LLC, both of which purport to be a limited liability companies with headquarters in Kimball, Tennessee, but which do not appear to be registered with either the Tennessee or the Georgia Secretaries of State.

19.

Defendants Shields, J. Dobson and T. Dobson also do business as Southern Real Estate, an unidentified entity.

20.

Defendant Steven Bosson (hereinafter, "Defendant Bosson") is an individual and resident of the State of Florida and may be served at 2975 NE 190 Street, #301, Miami, Florida 33180.

21.

Defendant Bosson is subject to the personal jurisdiction of this Court by virtue of O.C.G.A. § 9-10-91, the Georgia Long Arm Statute.

22.

Defendant Rodney Bradley (hereinafter, "Defendant Bradley") is an individual and resident of the State of Tennessee and may be served at 509 Young Avenue, Chattanooga, Tennessee 37405.

23.

Defendant Bradley is subject to the personal jurisdiction of this Court by virtue of O.C.G.A. § 9-10-91, the Georgia Long Arm Statute.

24.

Defendant The Haisten Group, Inc. (hereinafter, "Defendant Haisten") is a Tennessee corporation, and may be served at its principal office of 6005 Century Oaks Drive, Chattanooga, Tennessee 37416.

25.

Defendant Haisten is subject to the personal jurisdiction of this Court by virtue of O.C.G.A. § 9-10-91, the Georgia Long Arm Statute.

26.

Defendant Farm Credit Services of Mid-America, FLCA, a federal land credit association (hereinafter, "Defendant FCS"), may be served at its principal address of 1601 UPS Drive, Louisville, Kentucky 40223, copied to the United States attorney's office.

27.

Defendant FCS is subject to the personal jurisdiction of this Court by virtue of O.C.G.A. § 9-10-91, the Georgia Long Arm Statute.

28.

Defendant Southern Mountain Resorts, LLC (hereinafter, "Defendant SMR"; together with Defendants Southern Group, Southern Tennessee, Shields, J. Dobson, T. Dobson and Bradley, collectively, the "Southern Group Defendants") is a Tennessee limited liability company, with headquarters in Kimball, Tennessee, and is registered with the Georgia Secretary of State to transact business in Georgia.

29.

Defendant SMR may be served through its registered agent, Registered Agents, LTD., at 1201 W Peachtree Street NW, Atlanta, Georgia  30309.

30.

Defendant SMR is subject to the personal jurisdiction of this Court by virtue of its presence in the State of Georgia.

31.

Defendant Warranty Title Insurance Company, Inc. (hereinafter, "Defendant Warranty") is a Tennessee corporation, and may be served at its principal office of 2401 Memorial Boulevard, Springfield, Tennessee  37172.

32.

Defendant Warranty is subject to the personal jurisdiction of this Court by virtue of O.C.G.A. § 9-10-91, the Georgia Long Arm Statute.

33.

Defendants are joint tortfeasors.

**STATEMENT OF FACTS**

34.

Plaintiffs incorporate Paragraphs 1-33 as if fully restated herein.

35.

Plaintiffs were approached by Defendant Bosson about purchasing property at The Preserve at Rising Fawn located in Rising Fawn, Georgia (hereinafter, the "Development").

36.

Defendant Bosson acted as a recruiter for the Southern Group Defendants, recruiting investors for the Development.

37.

Defendant Bosson was acting on his own behalf and at the behest of the Southern Group Defendants.

38.

Defendant Bosson is not a licensed realtor in the State of Georgia.

39.

Defendant Bosson and the Southern Group Defendants knew that Plaintiffs would and did rely on Defendant Bosson's representations about the Development in deciding whether to purchase a lot within the Development.

40.

Defendant Bosson persuaded Plaintiffs and others to purchase property within the Development.

41.

Defendant Bosson and one or more of the Southern Group Defendants represented that any properties purchased within the Development would increase in value after purchase.

42.

Defendant Bosson and one or more of the Southern Group Defendants represented that the properties would increase in value, in part, because of amenities to be completed in the Development prior to May, 2009.

43.

Said amenities included but were not limited to roads, clubhouses and lakes.

44.

Plaintiffs were shown maps and plans of the amenities to be completed within the Development.

45.

Upon information and belief, not all of the promised amenities were completed as promised.

46.

Thus, Plaintiffs believed that they were purchasing property for investment purposes.

47.

Defendant Bosson has admitted that he obtained purchasers for lots in the Development.

48.

Defendant Bosson was paid $10,000.00 by one or more of the Southern Group Defendants for each lot in the Development for which he recruited a purchaser and the purchaser actually closed on the property.

49.

When Plaintiffs Jose and Isabel visited the Development prior to purchasing any property located therein, an agent of the Southern Group Defendants told them that there were two ways to get a loan to purchase property in the Development: the "conventional way" and an "option way."

50.

Plaintiffs Jose and Isabel did not have any money to contribute as a down payment towards the purchase or financing of property within the Development.

10

51.

Defendant Bosson, one or more of the Southern Group Defendants (including but not limited to Defendant Bradley) and Defendant FCS, through its employee Donald Bowlin (hereinafter, "Bowlin"), arranged a 100% financing plan for purchasers within the Development, which included a loan from FCS and an "option transaction" with Defendant Southern Group.

52.

Said Defendants arranged such financing plan to induce Plaintiffs and others to purchase property within the Development.

53.

Defendant J. Dobson told Plaintiffs Jose and Isabel that there were three categories of lots available for purchase within the Development: type A, type B and type C.

54.

Defendant J. Dobson represented to Plaintiffs Jose and Isabel that type A lots were the most expensive because they would have a better location and views, type B lots were less expensive because they would have a less desirable location and views and type C lot were the least expensive because they would have the least desirable location and views.

55.

Defendant J. Dobson told Plaintiffs Jose and Isabel that all type C lots had a set purchase price of $175,000.00.

56.

To induce Plaintiffs Jose and Isabel to purchase property within the Development, Defendant J. Dobson told them that he would authorize their purchase of a type B lot (better location and views) at the type C purchase price ($175,000.00).

57.

To further induce Plaintiffs Jose and Isabel to purchase property within the Development, Defendants Bosson and J. Dobson told Plaintiffs Jose and Isabel that they would not have to make any payments for three years.

58.

Prior to purchase, Defendant FCS required an appraisal from Defendant The Haisten Group, with whom Defendant FCS had a long-standing relationship.

59.

On or about March 5, 2008, John Timothy Haralson (hereinafter, "Haralson"), an appraiser employed by Defendant The Haisten Group, rendered a written appraisal (hereinafter, the "Lot 6 Appraisal Report") for Lot 6, Phase 10 of the Preserve, Rising Fawn, Georgia 30738 ("Lot 6") in the scope of his employment by Defendant The Haisten Group, which Lot 6

12

Appraisal Report stated that it was prepared for client Southern Home Mortgage, an affiliate of the Southern Group Defendants.

60.

On or about March 13, 2008, Haralson rendered a written appraisal (hereinafter, the "Lot 19 Appraisal Report") for Lot 19, Phase 10 of the Preserve, Rising Fawn, Georgia  30738 ("Lot 19") in the scope of his employment by Defendant The Haisten Group, which Lot 19 Appraisal Report stated that it was prepared for client Southern Home Mortgage, an affiliate of the Southern Group Defendants.

61.

Defendant The Haisten Group and Haralson each knew that the purchase price for Lots 6 and 19 was $175,000.00.

62.

Haralson, in the scope of his employment by Defendant The Haisten Group, appraised Lot 6 and Lot 19 for $175,000.00 each.

63.

All comparables used in each of the Lot 6 and Lot 19 Appraisal Reports were for lots located within the Development.

64.

Upon information and belief, most or all lots in the Development that were sold, no matter the size, were sold for $175,000.00.

65.

The sales prices of lots in the Development, including Lot 6 and Lot 19, were artificially set at $175,000.00.

66.

In reliance upon the Lot 6 Appraisal Report and the subsequent affirmations and ratification by Defendants FCS, Bosson and the Southern Group Defendants, Plaintiffs Jose and Isabel purchased Lot 6 from Defendant Southern Group for $175,000.00.

67.

In reliance upon the Lot 19 Appraisal Report and the subsequent affirmations and ratification by Defendants FCS, Bosson and the Southern Group Defendants, Plaintiff Paul purchased Lot 19 from Defendant Southern Group for $175,000.00.

68.

No Defendant ever disclosed any information to any of Plaintiffs concerning the true values of either Lot 6 or Lot 19.

69.

Defendant Southern Group required that Plaintiffs purchase Lots 6 and 19, respectively, in their own name using their own credit histories.

70.

Defendant Southern Group had "preferred" lenders and directed Plaintiffs to use Defendant FCS.

71.

Plaintiffs Jose and Isabel completed a loan application with Defendant FCS, at the offices of Defendant Southern Group, for the purchase of a lot within the Development.

72.

Defendant Warranty acted as settlement agent with respect to the loans from FCS to Plaintiffs.

**CLOSING TRANSACTIONS WITH PLAINTIFFS JOSE AND ISABEL**

73.

Defendant Bosson and one or more of the Southern Group Defendants invited Plaintiffs Jose and Isabel to visit the Development.

74.

While visiting the Development, Plaintiffs Jose and Isabel completed a financial form in order to obtain a loan from Defendant FCS, and gave said financial form to Defendant Bosson, who was with Plaintiffs Jose and Isabel when they visited the Development.

75.

Plaintiffs Jose and Isabel also disclosed certain further financial information to Defendant Bosson, both orally and in writing, in connection with obtaining of loan from Defendant FCS.

76.

Defendant Bosson then conveyed the loan application and financial information to Defendant FCS or Defendant Southern Group, or both.

77.

Defendant Bosson mailed to Plaintiffs Jose and Isabel, at their Georgia residence, the closing documents for the loan from Defendant FCS to Plaintiffs Jose and Isabel (the "Lot 6 FCS Loan").

78.

Defendant Bosson indicated on said closing documents where Plaintiffs Jose and Isabel were to sign or initial and directed them to mail the closing documents to Southern Real Estate, Attn: Defendant Rod Bradley at 1030 Main Street, Kimball, Tennessee 37347.

79.

Said closing documents included, *inter alia*, a Promissory Note/Loan Agreement (the "Lot 6 Senior Note"), a Basic Membership and Lending Relationship Agreement and a Security Deed (the "Lot 6 Senior Security Deed"), all of which were dated March 14, 2008.

80.

The principal amount payable under the Lot 6 Senior Note is recited as $148,750.00.

81.

The Lot 6 Senior Security Deed is signed by Defendant Bosson and Patty Martin (hereinafter, "Martin"), an employee of Defendant Warranty, as witnesses and is signed by Candy Patel as a notary.

82.

Neither Defendant Bosson, Martin nor Candy Patel witnessed Plaintiffs Jose and Isabel's signatures to the Lot 6 Senior Security Deed.

83.

Martin signed the Lot 6 Senior Security Deed as   "Closing Agent," and in so signing, represented as follows:

> In closing the above loan . . . I reviewed with and explained to the Borrower(s) the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower(s) of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower(s) of Borrower's rights.   After said review with and explanation to Borrower(s), Borrower(s) executed the Deed to Secure Debt and "Waiver of Borrower's Rights."   Based on said review with and explanation to the Borrower(s), it is my opinion that Borrower(s) knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

84.

Neither Plaintiff Jose nor Plaintiff Isabel has ever spoken to or corresponded with Martin.

85.

Defendant FCS falsely inflated Plaintiffs Jose and Isabel's income when documenting the Lot 6 FCS Loan.

86.

Defendant Bosson later mailed to Plaintiffs Jose and Isabel, at their Georgia residence, documents for an "option" transaction with Defendant Southern Group (the "Lot 6 Southern Transaction").

87.

At that time, Defendant Bosson stated, "The escrow account will pay the monthly payments."

88.

Defendant Bosson indicated on the closing documents for the Lot 6 Southern Transaction where Plaintiffs Jose and Isabel were to sign, witness and notarize and directed them to mail the documents to Southern Real Estate, Attn: Defendant Rod Bradley at 1030 Main Street, Kimball, Tennessee 37347.

89.

The documents for the Lot 6 Southern Transaction included, *inter alia*, a Promissory Note (the "Lot 6 Junior Note"), a Second Real Estate Mortgage (hereafter, the "Lot 6 Junior

Security Deed"), an Option Agreement (the "Lot 6 Option
Agreement") and an Escrow Agreement Addendum for Option
Agreement (the "Lot 6 Escrow Agreement"), all of which are dated
March 19, 2008.

90.

The principal amount payable under the Lot 6 Junior Note is
recited as $34,600.00.

91.

Someone executed the Lot 6 Junior Note, the Lot 6 Option
Agreement and the Lot 6 Junior Security Deed as witness for
Plaintiffs Jose and Isabel, however, no one witnessed Plaintiffs
Jose and Isabel sign same.

92.

Under the Lot 6 Option Agreement, Defendant Southern Group
paid $30,450.00 to Plaintiffs Jose and Isabel in exchange for an
option given to Defendant Southern Group to repurchase Lot 6.

93.

The $30,450.00 was to be used with the Lot 6 FCS Loan to
cover the purchase price of Lot 6.

94.

Pursuant to the Lot 6 Escrow Agreement, Defendant Southern
Group was to deposit $44,171.00 into an escrow account. The Lot
6 Escrow Agreement states as follows:

Said [$44,171.00] shall be used to pay the mortgage payments, property owner's association fees and assessments, property taxes and any other costs or expenses related to the real property that is the subject of the underlying Option Agreement as directed by [Plaintiffs Jose and Isabel].

95.

Lot 6 is the real property that is the subject of the underlying Option Agreement.

96.

The Lot 6 Escrow Agreement further states:

Unless directed otherwise, in writing, by the [Plaintiffs Jose and Isabel], [Defendant Southern Group] shall cause [Plaintiffs Jose and Isabel's] monthly mortgage payments, property tax bills and property owner's association fees and assessments to be paid directly from said [$44,171.00]. . .

97.

Defendant Southern Group breached their obligation to pay or ensure payment of the mortgage payments, property owner's association fees and assessments and property taxes with respect to Lot 6.

98.

With respect to the documents executed in connection with the Lot 6 FCS Loan, Plaintiffs Jose and Isabel never met with or spoke to a bank official, an attorney or a representative of Defendant Warranty prior to execution of same.

99.

With respect to the documents executed in connection with the Lot 6 Southern Transaction, Plaintiffs Jose and Isabel never met with or spoke to any attorney or a representative of any settlement agent prior to execution of same.

100.

Plaintiffs Jose and Isabel only ever spoke with Defendant Bosson and one or more of the Southern Group Defendants, in connection with both the Lot 6 FCS Loan closing and the Lot 6 Southern Transaction, prior to the closings.

101.

Thus, no attorney or anyone else was ever present to advise or explain to Plaintiffs Jose and Isabel the content of the documents they were directed to sign.

102.

Plaintiffs Jose and Isabel trusted Defendants Bosson and FCS and the Southern Group Defendants and believed that the documents they were directed to sign were legitimate.

103.

After the closing of the Lot 6 FCS Loan, as Defendant FCS sent monthly loan statements to Plaintiffs Jose and Isabel, they would notify Defendant Bradley, who was employed by the Southern Group Defendants, and request that he make payment on their behalf from their escrow account.

104.

Defendant Bradley advised Plaintiffs Jose and Isabel that they did not need to notify him as they received monthly loan statements because he was aware of the amount that needed to be paid each month.

**CLOSING TRANSACTION WITH PLAINTIFF PAUL**

105.

On or about March 26, 2009, Plaintiff Paul went to the Florida residence of Defendant Bosson and signed various documents in Defendant Bosson's home office that had been provided to Defendant Bosson by either one of the Southern Defendants or Defendant Warranty, or both.

106.

Only Defendant Bosson was present when Plaintiff Paul signed said documents.

107.

The closing documents for the loan from Defendant FCS to Plaintiff Paul for the purchase of Lot 19 included, *inter alia*, a Promissory Note/Loan Agreement (the "Lot 19 Senior Note"), a Basic Membership and Lending Relationship Agreement, and a Security Deed (hereafter, the "Lot 19 Senior Security Deed"), all dated March 26, 2008.

108.

The closing documents for the "option" transaction between Plaintiff Paul and Defendant Southern Group (the "Lot 19 Southern Transaction") included a Promissory Note (the "Lot 19 Junior Note"), a Second Real Estate Mortgage (hereafter, the "Lot 19 Junior Security Deed"), an Option Agreement (the "Lot 19 Option Agreement") and an Escrow Agreement Addendum for Option Agreement (the "Lot 19 Escrow Agreement"), all dated March 31, 2008.

109.

The principal amount payable under the Lot 19 Senior Note is recited as $148,750.00.

110.

The Lot 19 Senior Security Deed is signed by Defendant Bosson and Martin as witnesses and is signed by Barbara M. Munne as a notary.

111.

Neither Martin nor Barbara M. Munne were present at Defendant Bosson's home, nor did they witness Plaintiff Paul's signatures to the Lot 19 Senior Security Deed.

112.

At some point, Martin signed the Lot 19 Senior Security Deed as "Closing Agent," and in so signing, represented as follows:

In closing the above loan . . . I reviewed with and explained to the Borrower(s) the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower(s) of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower(s) of Borrower's rights. After said review with and explanation to Borrower(s), Borrower(s) executed the Deed to Secure Debt and "Waiver of Borrower's Rights." Based on said review with and explanation to the Borrower(s), it is my opinion that Borrower(s) knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

### 113.

Plaintiff Paul has never spoken to or corresponded with Martin.

### 114.

Defendant FCS falsely inflated Plaintiff Paul's income when documenting the Lot 19 FCS Loan.

### 115.

The principal amount payable under the Lot 19 Junior Note is recited as $34,600.00.

### 116.

Under the Lot 19 Option Agreement, Defendant Southern Group paid $30,450.00 to Plaintiff Paul in exchange for an option given to Defendant Southern Group to repurchase Lot 19.

117.

The $30,450.00 was to be used with the Lot 19 FCS Loan to cover the purchase price of Lot 19.

118.

Pursuant to the Lot 19 Escrow Agreement, Defendant Southern Group was to deposit $44,171.00 into an escrow account. The Lot 19 Escrow Agreement states as follows:

Said [$44,171.00] shall be used to pay the mortgage payments, property owner's association fees and assessments, property taxes and any other costs or expenses related to the real property that is the subject of the underlying Option Agreement as directed by [Plaintiff Paul].

119.

Lot 19 is the real property that is the subject of the underlying Lot 19 Option Agreement.

120.

The Lot 19 Escrow Agreement further states:

Unless directed otherwise, in writing, by the [Plaintiff Paul], [Defendant Southern Group] shall cause [Plaintiff Paul's] monthly mortgage payments, property tax bills and property owner's association fees and assessments to be paid directly from said [$44,171.00]. . .

121.

Defendant Southern Group breached their obligation to pay or ensure payment of the mortgage payments, property owner's association fees and assessments and property taxes with respect to Lot 19.

122.

With respect to the documents executed in connection with the Lot 19 FCS Loan, Plaintiff Paul never met with or spoke to a bank official, an attorney or a representative of Defendant Warranty, prior to execution of same.

123.

With respect to the documents executed in connection with the Lot 19 Southern Transaction, Plaintiff Paul never met with or spoke to any attorney or a representative of any settlement agent, prior to execution of same.

124.

Plaintiff Paul only ever spoke with Defendant Bosson in connection with both the Lot 19 FCS Loan and the Lot 19 Southern Transaction, prior to the closings.

125.

Thus, no attorney or anyone else was ever present to advise or explain to Plaintiff Paul the content of the documents he was directed to sign.

126.

Plaintiff Paul trusted Defendants Bosson and FCS and the Southern Group Defendants and believed that the documents he was directed to sign were legitimate.

127.

Defendant FCS and its employee Bowlin were aware of and endorsed the "option" scheme employed by Bosson and the Southern Group Defendants, as described herein.

128.

"Southern Real Estate" received funds at closing from proceeds of each of the Lot 6 and Lot 19 FCS Loans for acting as a real estate broker.

129.

In that context, the name "Southern Real Estate" was an alias for one or more of the Southern Group Defendants.

130.

As of April 10, 2009, Defendants Shields, J. Dobson and T. Dobson, d/b/a Mortgage Payment Services, LLC, represented to Plaintiffs Jose and Isabel that there was $31,201.46 remaining of their escrow funds.

131.

As of April 10, 2009, Defendants Shields, J. Dobson and T. Dobson, d/b/a Mortgage Payment Services, LLC, represented to Plaintiff Paul that there was $31,563.63 remaining of his escrow funds.

132.

Presumably, payments were made from the escrow funds by one or more of the Southern Group Defendants on behalf of Defendant Southern Group.

133.

Defendant Bradley managed the escrow funds on behalf of Defendant Southern Group and Defendants Shields, J. Dobson and T. Dobson, d/b/a Mortgage Payment Services, LLC.

134.

Beginning in May, 2009, Defendant FCS notified Plaintiffs that payments on the Lot 6 and Lot 19 FCS Loans were no longer current.

135.

Plaintiffs Jose and Isabel notified Defendant Bradley that the May, 2009 payment had not been made.

136.

On June 19, 2009, Plaintiff Isabel forwarded to Defendant Bradley via electronic mail the June, 2009, loan statement from Defendant FCS.

137.

Defendant Rod Bradley replied, "Thanks for sending your statement. We will take care of it."

138.

The July, 2009 payments to Defendant FCS on behalf of Plaintiffs were not timely made.

139.

No payments have been made on behalf of any Plaintiffs by Defendant Southern Group or Defendants Shields, J. Dobson and T. Dobson, d/b/a Mortgage Payment Services, LLC, to Defendant FCS since the July, 2009 payment.

140.

Beginning with the Lot 19 FCS Loan payment to Defendant FCS due in August, 2009, Plaintiff Paul began making monthly payments to Defendant FCS.

141.

After Defendant Southern Group, Defendants Shields, J. Dobson and T. Dobson, d/b/a Mortgage Payment Services, LLC and Defendant Bradley, stopped making payments to Defendant FCS, Plaintiff Paul spoke with an employee of the Southern Group Defendants, who advised Plaintiff Paul that the reason payments were not being made was because of "accounting issues."

142.

Plaintiff Paul also spoke with Keren Davies, who stated that there were problems with accounting and procedures and that Defendant Southern Group would make good on the payments that had been missed.

143.

Keren Davies also told Plaintiffs Jose and Isabel that certain missed payments would be paid that never were paid.

144.

At the time of such statements, Keren Davies was a representative and employee of one or more of the Southern Group Defendants.

145.

The amounts payable under the Lot 6 and Lot 19 Junior Notes were presumably used to fund the escrow accounts established by the Lot 6 and Lot 19 Escrow Agreements.

146.

Those amounts have been misappropriated, in part, by one or more of the Southern Group Defendants.

147.

In September, 2009, Plaintiffs Jose and Isabel went to the office of Defendant Southern Group and met with Defendant J. Dobson, who advised Plaintiffs Jose and Isabel that he would "fix the situation."

148.

Defendant J. Dobson was referring to the fact that Plaintiffs' loan payments had not been paid.

149.

At that meeting, Defendant J. Dobson told Plaintiffs Jose
and Isabel that he was going to pay all of the overdue mortgage
payments within a week.

150.

He further stated that he was developing an exit strategy
and wanted to restructure all loans.

151.

Defendant Bosson stated to Plaintiffs on September 9, 2009:

Josh Dobson . . . said that he will have the money and will
pay the Sept. payment for everyone and will reimburse
anyone who already made payments themselves.  He said once
that's done he'll get the letters out to each customer
saying that it was not the customer's fault the payments
were late. . .

152.

Defendant Bosson stated to Plaintiffs on September 20,
2009, "[Defendant J. Dobson] said he intends to get everyone's
payments caught up, fix everyone's credit, and keep the payments
current."

153.

John "JB" Mount (hereinafter, "Mount"), an employee of the
Southern Group Defendants, told Plaintiff Isabel on October 9,
2009, through Defendant Bosson, that Defendant J. Dobson wanted
Mount to convey the following to Plaintiff Isabel:

First, that he has been in ongoing negotiations with the
lenders to obtain a leniency period.  This would be a

period where no payments are due and no further credit damage is done. Josh says the negotiations were very promising and that he would know if this extension was given by early next week. If the extension is not given then your situation will be remedied by no later than the middle of that following week. The would be the 21st of October.

154.

On October 14, 2009, Mount, on behalf of one or more of the Southern Group Defendants, forwarded a form letter to Defendant Bosson for dissemination to Defendant Bosson's "clients", which are presumably those people whom Defendant Bosson recruited to invest in the Development.

155.

That form letter was disseminated to Plaintiffs, and states, in part, as follows:

The most recent effort has been the negotiation of a leniency period from the lenders. This would be a negotiated period of time in which payments are not due, the banks do not harass the clients any further, and no further damage is inflicted upon the clients' credit. This period will give ample time for the payment allocation system to be restructured, customer files to be reviewed, and all necessary repairs to be made. We have received positive feedback from all lenders and are confident all lenders will grant the required time. **If not, then Southern will make the situation right through other means.** (Emphasis supplied.)

156.

Further, the form letter discusses three (3) bogus exit strategies for getting out from underneath properties in the

Development and the loans borrowed in connection with the purchase of same.

### 157.

The form letter states as follows:   "Exit Option 1: Southern continues to make your payments for the agreed time. Once the agreement is over, you simply keep making payments until the land sells."

### 158.

With the three (3) exit strategies disseminated to Plaintiffs, the Southern Group Defendants were attempting to further defraud Plaintiffs and others.

### 159.

On November 8, 2009, Defendant Bosson stated to Plaintiffs, "[Defendant J. Dobson] came to Miami in early September and said to everyone's face that he would bring everyone's loans current by the end of September in accordance with his obligation and he didn't do it."

### 160.

Defendant Southern Group's last payment on behalf of Plaintiffs to The Preserve Property Owners' Association was on April 1, 2010.

### 161.

Plaintiffs have discovered that neither Defendant Southern Group nor Defendants Shields, J. Dobson and T. Dobson, d/b/a

Mortgage Payment Services, LLC, ever paid any property taxes for
Lots 6 and 19.

162.

As a result, the Dade County Tax Commissioner filed tax
liens against Lots 6 and 19 for tax year 2008.

163.

James Johnson purchased from the Dade County Tax
Commissioner the tax liens filed against Lots 6 and 19.

164.

Because neither Defendant Southern Group nor Defendants
Shields, J. Dobson and T. Dobson, d/b/a Mortgage Payment
Services, LLC, has paid the property taxes for Lots 6 and 19 for
tax year 2009, said taxes are currently past due.

165.

Defendants Southern Group and Defendants Shields, J. Dobson
and T. Dobson, d/b/a Mortgage Payment Services, LLC, continue to
not pay the property taxes for Lots 6 and 19.

166.

Since Plaintiffs' purchase of their respective Lots,
Plaintiffs have determined that the Lots are each valued at less
than the amounts stated in the respective Appraisal Reports.

167.

As a result of the purchase of their respective Lots and
the Defendants' actions described herein, Plaintiffs have

suffered damages while Defendants have experienced financial gain.

168.

Plaintiffs' credit scores have been impacted and damaged as a result of Defendant Southern Group's breach of the Lot 6 and Lot 19 Escrow Agreements.

**COUNT ONE:**

**FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT,**

**18 U.S.C.A. § 1961, et. seq.**

**(as to all Defendants)**

169.

Plaintiffs incorporate Paragraphs 1-168 as if fully restated herein.

170.

All of the Defendants are associated-in-fact and constitute an enterprise which is engaged in, or the activities of which affect, interstate commerce.

171.

Defendants conspired to and have received income derived from a pattern of racketeering activity, and have used and/or invested such income or a part thereof, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, an enterprise which is engaged in, or the activities of which affect, interstate commerce.

35

172.

Defendants conspired to and have, through a pattern of racketeering activity, acquired and/or maintained an interest in and/or control of an enterprise which is engaged in, or the activities of which affect, interstate commerce.

173.

Defendants are employed by or associated with an enterprise engaged in, or the activities of which affect, interstate commerce, and conspired to and have conducted and/or participated in the conduct of such enterprise's affairs through a pattern of racketeering activity.

174.

Defendants' racketeering activities include commission of the following:

a.    Federal mail fraud in violation of 18 U.S.C. § 1341; and

b.    Federal bank fraud in violation of 18 U.S.C. § 1344.

175.

Defendant Bosson committed mail fraud on behalf of the enterprise when he mailed closing documents to Plaintiffs Jose and Isabel.

176.

Plaintiffs believe that their closing documents were thereafter sent through the mail one or more times, and expect

to determine which of the Defendants sent the documents where during discovery.

177.

All of Defendants' actions up until and including the time of the closing of the loans from Defendant FCS to Plaintiffs were part of a scheme to knowingly defraud Defendant FCS, in violation of 18 U.S.C. § 1344.

178.

Plaintiffs have suffered damages proximately caused by Defendants' actions.

179.

Defendants' actions showed such willful misconduct, malice, fraud, wantonness, oppression, or the entire want of care as to raise the presumption of conscious indifference to consequences and a specific intent to cause harm.

**COUNT TWO:**

**GEORGIA RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT,**

**O.C.G.A. § 16-14-1, et. seq.**

**(as to all Defendants)**

180.

Plaintiffs incorporate Paragraphs 1-179 as if fully restated herein.

181.

Defendants, through a pattern of racketeering activity and/or proceeds derived therefrom, have conspired to and have actually acquired and/or maintained an interest in and/or control of an enterprise, real property and personal property, including money.

182.

Defendants are employed by or associated with the enterprise referenced in Count One above and have conspired to and have actually conducted and/or participated in such enterprise through a pattern of racketeering activity.

183.

Defendants' racketeering activities include commission of the following:

- Residential mortgage fraud in violation of O.C.G.A. § 16-8-102;

- Theft by deception in violation of O.C.G.A. § 16-8-3;

- The following conduct defined as racketeering activity under 18 U.S.C. § 1961 (1)(B):
  o Federal mail fraud in violation of 18 U.S.C. § 1341; and

  o Federal bank fraud in violation of 18 U.S.C. § 1344.

184.

Defendant Bosson committed mail fraud on behalf of the enterprise when he mailed closing documents to Plaintiffs Jose and Isabel.

185.

Plaintiffs believe that their closing documents were thereafter sent through the mail one or more times, and expect to determine which of the Defendants sent the documents where during discovery.

186.

All of Defendants' actions up until and including the time of the closing of the loans from Defendant FCS to Plaintiffs were part of a scheme to knowingly defraud Defendant FCS, in violation of 18 U.S.C. § 1344.

187.

Plaintiffs have suffered damages proximately caused by Defendants' actions.

188.

Defendants' actions showed such willful misconduct, malice, fraud, wantonness, oppression, or the entire want of care as to raise the presumption of conscious indifference to consequences and a specific intent to cause harm.

## COUNT THREE:

### FRAUD

### (as to all Defendants)

189.

Plaintiffs incorporate Paragraphs 1-188 as if fully restated herein.

190.

Defendants knowingly misrepresented the value of Lots 6 and 19 and knowingly concealed from Plaintiffs the true value of Lots 6 and 19.

191.

Defendants knowingly misrepresented to and concealed from Plaintiffs material facts in connection with the documentation of the loans from Defendant FCS to Plaintiffs.

192.

Defendant Bosson and one or more of the Southern Group Defendants knowingly misrepresented material facts in connection with the documentation of the option transactions between Plaintiffs and Defendant Southern Group.

193.

Defendant Bosson and one or more of the Southern Group Defendants knowingly misrepresented that Plaintiffs were making an investment that would provide a return.

194.

Defendant FCS knowingly misrepresented Plaintiffs' incomes and intentions with respect to Lots 6 and 19 when documenting the loans from FCS to Plaintiffs.

195.

One or more of the Southern Group Defendants have knowingly concealed the whereabouts of Plaintiffs' escrow funds.

196.

One or more of the Southern Group Defendants misrepresented to Plaintiffs that there would be new "exit strategies" put into place to allow Plaintiffs to get out from under their loans from FCS.

197.

Defendant Bosson and one or more of the Southern Group Defendants misrepresented to Plaintiffs that their loan payments, property taxes and owners' association fees would continually be made from their escrow accounts.

198.

Martin, in the scope of her employment by Defendant Warranty, knowingly misrepresented that she had advised Plaintiffs of certain rights in connection with their Senior Security Deeds.

41

199.

Defendant Bosson knowingly misrepresented that he had witnessed Plaintiffs Jose and Isabel's signatures to certain closing documents.

200.

Martin knowingly misrepresented that she had witnessed all of Plaintiffs' signatures to certain closing documents.

201.

At the time of Martin's actions described herein, Martin was acting within the scope of her employment by Defendant Warranty.

202.

Defendants Shields, J. Dobson and T. Dobson, d/b/a Mortgage Payment Services, LLC knowingly misrepresented the amounts remaining of Plaintiffs' escrow funds.

203.

Defendant J. Dobson has continuously knowingly misrepresented that he would pay Plaintiffs' past due loan payments owing to Defendant FCS.

204.

Plaintiffs were in a confidential relationship with one or more of the Defendants.

205.

Defendants knew the representations were false at the time made.

206.

Defendants intended to deceive Plaintiffs and intended to induce Plaintiffs to act and for Plaintiffs to rely upon such misrepresentations and concealment.

207.

Plaintiffs did act and did reasonably and justifiably rely upon Defendants' misrepresentations and concealment.

208.

Plaintiffs were injured and suffered damages proximately caused by Defendants' misrepresentations and concealment.

209.

Defendants' actions were undertaken in bad faith, have been stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense.

210.

Defendants' actions showed such willful misconduct, malice, fraud, wantonness, oppression, or the entire want of care as to raise the presumption of conscious indifference to consequences and a specific intent to cause harm.

**COUNT FOUR:**

**NEGLIGENCE**

**(as to Defendant The Haisten Group)**

211.

Plaintiffs incorporate Paragraphs 1-210 as if fully restated herein.

212.

Defendant The Haisten Group owed Plaintiffs a duty to exercise a reasonable degree of care and competence in rendering their business services.

213.

Defendant The Haisten Group breached its duty to Plaintiffs by failing to ensure that the appraised values in the Lot 6 and Lot 19 Appraisal Reports were representative of the true values of Lots 6 and 19.

214.

Plaintiffs suffered damages proximately caused by Defendant's breach of duty.

215.

Defendant's actions were undertaken in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

216.

Defendant's actions showed such willful misconduct, malice, fraud, wantonness, oppression, or the entire want of care as to raise the presumption of conscious indifference to consequences and a specific intent to cause harm.

## COUNT FIVE:

### NEGLIGENCE

### (as to The Southern Group Defendants)

217.

Plaintiffs incorporate Paragraphs 1-216 as if fully restated herein.

218.

In administering Plaintiffs' escrow accounts, the Southern Group Defendants owed Plaintiffs a duty to exercise that degree of care which every prudent man takes of his own property of a similar nature.

219.

The Southern Group Defendants breached their duty to Plaintiffs.

220.

Plaintiffs suffered damages proximately caused by Defendants' breach of duty.

221.

Defendants' actions were undertaken in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

222.

Defendants' actions showed such willful misconduct, malice, fraud, wantonness, oppression, or the entire want of care as to raise the presumption of conscious indifference to consequences and a specific intent to cause harm.

**COUNT SIX:**

**BREACH OF CONTRACT**

**(as to Defendant Southern Group)**

223.

Plaintiffs incorporate Paragraphs 1-222 as if fully restated herein.

224.

The Option Agreements and Escrow Addenda to Option Agreements each constitute valid contracts between Plaintiffs and Defendant Southern Group.

225.

Defendant Southern Group's failure to pay mortgage payments, taxes and property owners' association fees constitute breaches of said contracts.

226.

Plaintiffs have suffered damages proximately caused by Defendant Southern Group's breaches of said contract.

227.

Defendant's actions were undertaken in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

**COUNT SEVEN:**

**VIOLATION OF O.C.G.A. § 7-7-1, et seq.**

**(as to Defendant Bosson)**

228.

Plaintiffs incorporate Paragraphs 1-227 as if fully restated herein.

229.

Defendant Bosson's made false and deceptive representations to Plaintiffs concerning, *inter alia*:

   a.   the true value of Lots 6 and 19;

   b.   material facts in connection with the documentation of the loans from Defendant FCS to Plaintiffs;

   c.   material facts in connection with the documentation of the option transactions between Plaintiffs and Defendant Southern Group;

   d.   that Plaintiffs were making an investment that would provide a return;

e.    that  Plaintiffs'  loan  payments,  property  taxes  and
owners'  association  fees  would  continually  be  made
from their escrow accounts.

230.

Such  representations  were  also  false  and  misleading  and
omitted  material  facts  in  the  offer  of  services  of  a  loan
broker.

231.

Defendant Bosson signed closing documents as a witness when
he did not witness the execution of same.

232.

Defendant  Bosson  had  a  notary  notarize  closing  documents
when the notary did not witness the execution of same.

233.

Defendant  Bosson  engaged  in  such  acts  and  made  such
misrepresentations which operated as a fraud and deception upon
Plaintiffs  in  connection  with  the  offer  of  the  services  of  a
loan broker.

234.

Defendant  Bosson's  acts  and  practices  employed  in
recruiting  purchasers  of  property  within  the  Development  are
unfair and deceptive.

235.

Plaintiffs suffered damages proximately caused by Defendant Bosson's representations, acts and practices.

236.

Defendant Bosson's actions showed such willful misconduct, malice, fraud, wantonness, oppression, or the entire want of care as to raise the presumption of conscious indifference to consequences and a specific intent to cause harm.

237.

Defendant Bosson's actions were undertaken in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

**COUNT EIGHT:**

**CONVERSION**

**(as to The Southern Group Defendants)**

238.

Plaintiffs incorporate Paragraphs 1-237 as if fully restated herein.

239.

The escrow funds in the escrow accounts belonged to and were owned by Plaintiffs.

240.

One or more of the Southern Group Defendants had actual possession of the escrow funds.

241.

One or more of the Southern Group Defendants have exceeded their authority with respect to the escrow funds and have wrongfully converted said funds to their own use.

242.

The value of the converted funds amounts to approximately $28,336.70 with respect to Plaintiffs Jose and Isabel and approximately $28,713.63 with respect to Plaintiff Paul, for a total of $57,050.33.

243.

The Southern Group Defendants' actions showed such willful misconduct, malice, fraud, wantonness, oppression, or the entire want of care as to raise the presumption of conscious indifference to consequences and a specific intent to cause harm.

244.

The Southern Group Defendants' actions were undertaken in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

**COUNT NINE:**

**MONEY HAD AND RECEIVED**

**(as to The Southern Group Defendants)**

245.

Plaintiffs incorporate Paragraphs 1-244 as if fully restated herein.

246.

One or more of the Southern Group Defendants has Plaintiffs' escrow funds in its possession, and which in fairness should be paid to the Plaintiffs.

247.

In equity and good conscience, said Defendant(s) is not entitled to the money as against the Plaintiffs because said Defendant(s) would be unjustly enriched.

248.

The escrow funds were intended to be used for the benefit of Plaintiffs.

249.

Said Defendant(s) has not given the escrow funds to the Plaintiffs.

250.

The Southern Group Defendants' actions showed such willful misconduct, malice, fraud, wantonness, oppression, or the entire want of care as to raise the presumption of conscious indifference to consequences and a specific intent to cause harm.

251.

The Southern Group Defendants' actions were undertaken in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

## COUNT TEN:

### BREACH OF FIDUCIARY DUTY

### (as to The Southern Group Defendants)

252.

Plaintiffs incorporate Paragraphs 1-251 as if fully restated herein.

253.

One or more of the Southern Group Defendants owed a fiduciary duty to Plaintiffs with respect to the escrow funds.

254.

One or more of the Southern Group Defendants have breached that fiduciary duty by misappropriating the escrow funds.

255.

Plaintiffs have suffered damages proximately caused by said breach.

256.

The Southern Group Defendants' actions showed such willful misconduct, malice, fraud, wantonness, oppression, or the entire want of care as to raise the presumption of conscious

indifference to consequences and a specific intent to cause harm.

### 257.

The Southern Group Defendants' actions were undertaken in bad faith, have been stubbornly litigious, and have caused Plaintiffs unnecessary trouble and expense.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief against Defendants:

1) That a Summons be issued and process served upon each Defendant;

2) That all factual issues be resolved in a trial by jury;

3) That judgment be entered in favor of Plaintiffs for actual damages sustained as a result of the actions described in Counts One through Ten of this Complaint;

4) That judgment be entered in favor of Plaintiffs for treble damages as a result of the actions described in Counts One and Two of this Complaint;

5) That judgment be entered in favor of Plaintiffs for all attorneys' fees, costs, and other expenses of litigation incurred as a result of the actions described in Counts One through Ten of this Complaint;

6) That Plaintiffs be awarded special damages including attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, in an amount to be determined at trial;

7) That judgment be entered in favor of Plaintiffs for punitive damages as a result of the actions described in Counts One through Ten of this Complaint, excluding Count Six;

8) That Plaintiffs be awarded of actual damages, attorneys' fees and costs and punitive damages as a result of the actions described in Count Seven of this Complaint;

9) That judgment be entered in favor of Plaintiffs for pre-judgment interest;

10) That costs of this action be imposed upon Defendants; and

11) Such other relief as this Court deems just and proper.

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 5.1 (C), I certify this pleading was prepared per L.R. 5.1(B) in Courier New, 12 point typeface.

Respectfully submitted, this the 2-5 day of February, 2010.

Richard C. Wayne, Sr.
Georgia Bar No. 742725
Counsel for Plaintiffs

Richard C. Wayne & Associates, P.C.
Attorneys & Counselors at Law
Peachtree | 25th Building
1720 Peachtree Street NW, Suite 118
Atlanta, Georgia 30309
Telephone: (404) 231-1444
Facsimile: (404) 231-1666
Email: richard@rwaynelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I will personally serve the foregoing COMPLAINT to the following non-CM/ECF participants by personal service:

Southern Group, LLC

Southern Real Estate of Tennessee, LLC

Travis Shields

(individually, and d/b/a Southern Real Estate, Southern Real Estate, LLC and Mortgage Payment Services, LLC)

Joshua Dobson

(individually, and d/b/a Southern Real Estate, Southern Real Estate, LLC and Mortgage Payment Services, LLC)

Thomas Dobson

(individually, and d/b/a Southern Real Estate, Southern Real Estate, LLC and Mortgage Payment Services, LLC)

Steven Bosson

Rodney Bradley

The Haisten Group, Inc.

Farm Credit Services of Mid-America, FLCA

Southern Mountain Resorts, LLC

Warranty Title Insurance Company, Inc.

This 25 day of February, 2010.

Richard C. Wayne, Sr.
Georgia Bar No. 742725
Counsel for Plaintiffs

Richard C. Wayne & Associates, P.C.
Attorneys & Counselors at Law
Peachtree | 25th Building
1720 Peachtree Street NW, Suite 118
Atlanta, Georgia 30309
Telephone: (404) 231-1444
Facsimile: (404) 231-1666
Email: richard@rwaynelaw.com

## VERIFICATION

Personally appeared before the undersigned officer, duly authorized by the laws of the State of Georgia to administer oaths, **Plaintiffs Jose Velasquez and Maria I. Roldos**, who, after first being duly sworn, state that the information contained in the foregoing Summons and Complaint is true and correct.

JOSE VELASQUEZ

MARIA I. ROLDOS

Sworn to and subscribed
before me on this 24th day
of February, 2010.

Notary Public

My Commission expires:

## VERIFICATION

Personally appeared before the undersigned officer, duly authorized to administer oaths, **Plaintiff Paul E. Dyer,** who, after first being duly sworn, states that the information contained in the foregoing Summons and Complaint is true and correct.

_Paul E. Dyer_
PAUL E. DYER

Sworn to and subscribed
before me on this ___ day
of _____ , 2010.

_____ [SEAL]
Notary Public.

My Commission expires:

Légalisation numéro 8'926 :

Sur la base d'une comparaison de signature, la soussignée, <u>VERONIQUE ANSERMOZ</u>, notaire à CH - 1860 Aigle, atteste l'authenticité de la signature apposée ci-dessus par **_Paul Edward DYER_**, domicilié à 1854 Leysin, Leysin American School SA, lequel a justifié de ses identité et signature par le production d'une pièce officielle, sans se prononcer sur le contenu du document légalisé.

AIGLE, le douze février deux mil dix.

